IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2013 AUG 16  AM 8: 57

CLERK, US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
        DEPUTY

CLICK-TO-CALL TECHNOLOGIES LP,
                    Plaintiff,

-vs-                                             Case No.  A-12-CV-465-SS

AT&T, INC.; YP HOLDINGS LLC; INGENIO,
INC.; YELLOWPAGES.COM LLC; ETHER, a
Division of Ingenio, Inc.; and INGENIO, INC.
d/b/a Keen,
                    Defendants.
_____

CLICK-TO-CALL TECHNOLOGIES LP,
                    Plaintiff,

-vs-                                             Case No.  A-12-CV-468-SS

ORACLE CORPORATION; ART
TECHNOLOGY GROUP, INC.; ESTARA, INC.;
DELL, INC.; CARNIVAL CRUISE LINES; THE
HARTFORD FINANCIAL SERVICES GROUP,
INC.; BMO HARRIS BANK N.A.; THE
ALLSTATE CORPORATION; ESURANCE;
HSBC FINANCE CORPORATION; and MACY'S
INC.,
                    Defendants.
_____

CLICK-TO-CALL TECHNOLOGIES LP,
                    Plaintiff,

-vs-                                             Case No.  A-12-CV-469-SS

EHARMONY, INC.,
                    Defendant.
_____

## CONSOLIDATED *MARKMAN* ORDER



BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Plaintiff Click-to-Call Technologies LP (CTC)'s Opening Claim Construction Brief [#87],[1] Defendants' Opening Claim Construction Brief [#88], CTC's Responsive Brief [#90], Defendants' Response Brief [#89], the parties' Joint Disputed Claims Chart [#95], CTC's Opening Post-*Markman* Brief [#99], Defendants' Opening Post-*Markman* Brief [#100], CTC's Responsive Post-*Markman* Brief [#106], and Defendants' Responsive Post-*Markman* Brief [#107]; the Report and Recommendation of the Special Master [#124]; CTC's Objections [#130], and Defendants' Response [#135]; and Defendants' Objections [#129], and CTC's Response [#136]. Having reviewed the documents, the governing law, the arguments of the parties at the *Markman* hearing, and the file as a whole, the Court now enters the following opinion and orders.

## Background

These three cases are patent infringement suits brought by CTC against the various Defendants. At issue is United States Patent Number 5,818,836 (the '836 patent), issued October 6, 1998, entitled "Method and Apparatus for Anonymous Voice Communication Using an Online Data Service."[2] At a scheduling conference held on August 23, 2012, the parties agreed to a consolidated technical tutorial and *Markman* hearing in all three cause numbers. The Court, through Special Master Karl Bayer, held the consolidated *Markman* hearing on February 26, 2013. Following the *Markman* hearing, the parties submitted additional briefing. The Special Master issued his Report and Recommendation on claim construction on July 23, 2013. To the extent the parties have made

---

[1] Docket entry numbers refer to filings in cause number 12-CA-465. The parties consented to a consolidated *Markman* hearing, and identical briefs were filed in all three cases. The consolidated R&R was also filed separately in each case.

[2] The specific claims alleged to be infringed are from the '836 Patent Reexamination Certificate, referred to in this order as the '836 Patent RC.

specific objections to the Special Master's factual findings or legal conclusions, they are entitled to de novo review of those findings and conclusions. FED. R. CIV. P. 53(f).

The '836 Patent generally covers a system and method for making voice calls by using an "on-line data system" to connect two parties over the Internet. When the inventor, Stephen C. DuVal, originally filed the '836 Patent, it was focused heavily on the anonymous nature of the voice calls. For example, the abstract opens by describing the invention as "[a]n anonymous telephone communication system." '836 Patent Abstract. In layman's terms, the general idea was for two parties to meet anonymously using some iteration of the then-still-novel Internet, perhaps through email or using a chat room. The parties could then use the invention to establish a voice call without divulging their identities or phone numbers to each other. Accordingly, many of the claims in the original '836 Patent involved what DuVal termed "an anonymous voice system." *E.g.*, '836 Patent col.21 ll.25–27 (claim 2); *id.* ll.28–30 (claim 3); *id.* ll.31–34 (claim 4).

In April 2004, Defendant Ingenio, Inc., requested a reexamination of the '836 Patent, arguing the patent's claims were invalid in light of prior art the United States Patent and Trademark Office had not previously considered. The PTO rejected all claims of the original '836 Patent as anticipated or obvious in light of the new prior art references. Defs.' Opening Br. [#88-3], Ex. 3. DuVal and the PTO battled over the '836 Patent's claims for the next four years. Ultimately, the PTO issued an Ex Parte Reexamination Certificate on September 4, 2008, cancelling six of the original claims, amending fifteen claims, and adding nine new claims. *Id.* [#88-5], Ex. 5. Notably, the phrase "anonymous voice system" disappeared from the claims allowed in the Reexamination Certificate.

While anonymity is still an aspect of some of the claims, the scope of the patent is considerably different than when it first issued in 1998.[3]

## Analysis

### I.        Claim Construction—Legal Standard

When construing claims, courts begin with "an examination of the intrinsic evidence, i.e., the claims, the rest of the specification and, if in evidence, the prosecution history." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *see also Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1327 (Fed. Cir. 2001).

The words in the claims themselves are of primary importance in the analysis, as the claim language in a patent defines the scope of the invention. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The words of a claim "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."[4] *Id.* at 1313. The inquiry into how a person of ordinary skill in the art understands a claim term provides an "objective baseline" from which to begin claim interpretation. *Id.* The person of ordinary skill in the art is understood to read a claim term not only in the context

---

[3] DuVal attempted to amend the patent to remove uses of the word "anonymous" before various other phrases, such as "voice communication," and "voice system." Pl.'s Opening Post-*Markman* Br. [#99-1], Ex. 19, at CTC-004524–26. DuVal's amendments were intended "to remove selected occurrences of the term 'anonymous' so that the Title, Abstract, Technical Field and Summary agree with the broadest claims" allowed in the Reexamination Certificate. *Id.* at CTC-004536. The examiner refused to allow these amendments, reasoning they may raise "a new matter issue" and delay the reexamination proceedings. Pl.'s Ex. 17, at CTC-004471. As a result, the '836 Patent is still replete with references to anonymous communications even though the anonymity required by the claim terms has significantly changed.

[4] This hypothetical person is now commonly referred to simply as an "ordinarily skilled artisan." *E.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1365–66 (Fed. Cir. 2013).

of the particular claim in which the term appears, but in the context of the entire patent, including

the specification; thus, both the plain language of the claims and the context in which the various

terms appear "provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314.

The specification also plays a significant role in the analysis. *Id.* at 1315. The Federal Circuit

has repeatedly reaffirmed the principle that the specification "is always highly relevant . . . . Usually,

it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics*

*Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In interpreting the effect the

specification has on the claim limitations, however, courts must pay special attention to the

admonition that one looks "to the specification to ascertain the meaning of the claim term as it is

used by the inventor in the context of the entirety of his invention, and not merely to limit a claim

term." *Interactive Gift*, 256 F.3d at 1332 (internal quotation marks and citations omitted).

The final form of intrinsic evidence the Court may consider is the prosecution history.

Although the prosecution history "represents an ongoing negotiation between the PTO and the

applicant" and therefore "often lacks the clarity of the specification and thus is less useful for claim

construction purposes," it can nonetheless "often inform the meaning of the claim language by

demonstrating how the inventor understood the invention and whether the inventor limited the

invention in the course of prosecution, making the claim scope narrower than it would otherwise be."

*Phillips*, 415 F.3d at 1317.

Aside from the intrinsic evidence, the Court may also consult "extrinsic evidence," which

is "all evidence external to the patent and prosecution history, including expert and inventor

testimony, dictionaries, and learned treatises." *Id.* While extrinsic evidence "can shed useful light

on the relevant art," the Federal Circuit has explained it is "less significant than the intrinsic record

in determining 'the legally operative meaning of claim language.'" *Id.* at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). Extrinsic evidence in the form of expert testimony may be useful to a court for "a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* at 1318. However, conclusory, unsupported assertions by an expert as to the definition of a claim term are not useful, and should be discounted. *Id.* In general, extrinsic evidence is considered "less reliable than the patent and its prosecution history in determining how to read claim terms," although it may be helpful. *Id.*

The purpose of claim construction is to "'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)). Thus, "[w]hen the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *Id.* However, "district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims." *Id.* For example, no construction is required if the requested construction would be "an exercise in redundancy," or if "the disputed issue is the proper application of a claim term to an accused process rather the scope of the term." *Id.* (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001)).

## II.      Application

## A.      Special Master's Recommendations

The Special Master's recommended constructions are as follows, with two modifications

(explained in more detail below) noted:

| Claim Term | Recommended Construction |
|---|---|
| "Party"<br>(Claims 1 and 12) | A person or group participating in an action. |
| "on-line data service"<br>(Claim 1) | Service provided by an on-line data system such as electronic mail, chat, newsgroups, or access to information. |
| "on-line data system"<br>(Claim 12) | Computing device or distributed computing system with storage and communications capability which provides services on-line such as electronic mail, chat, newsgroups, or access to information.<br><br>**\*Accepted as modified:**<br>Computing device or distributed computing system with storage and communications capability which provides services on-line such as electronic mail, chat, newsgroups, or access to information *beyond that used in the management and operation of a telephone conferencing system.* |
| "establishing an electronic communication between the first party and the second party"<br>(Claim 1) | No further construction necessary. See construction of "party." |
| "on-line data service between the first party and the second party"<br>(Claim 1) | No further construction necessary. See construction of "party" and "on-line data service." |
| "on-line data system that is coupled to the data terminal of each party"<br>(Claim 12) | No further construction necessary. See construction of "party" and "on-line data system." |

| | |
|---|---|
| "anonymous"<br>(Claims 1 and 12) | Identity has not been revealed. |
| "data terminal"<br>(Claims 1 and 12) | Computing device capable of sending and/or receiving data. |
| "information publicly accessible"<br>(Claims 1 and 12) | Information that is accessible by the public, including information that requires a password to access if members of the public are able to obtain a password by registering or paying for a subscription. |
| "second information representing a communication from the second party"<br>(Claims 1 and 12) | A communication from the second party. |
| "requesting a voice communication between the first party and the second party through the on-line data service"<br>(Claim 1) | The request for a voice communication between the first party and the second party originates outside the on-line data service. |
| "voice system"<br>(Claims 1 and 12) | A system including (a) hardware connected to a telephone network that provides access line termination and switching, (b) hardware connected to a data communication link to the on-line data service [or system], and (c) software that causes the system to make and/or receive, and then connect, two telephone calls when directed by the on-line data service [or system].<br><br>*Accepted as modified:<br>A system including (a) hardware connected to a telephone network that provides access line termination and switching, (b) hardware connected to a data communication link to the on-line data service [or system], and (c) software that *has the capability to cause the system to both make and receive*, and then connect, two telephone calls when directed by the on-line data service [or system]. |

| "connect command"<br>(Claim 12) | Message with information on the first and second parties, including for each party the information shown in the caller info box **122** shown in Fig. 6 and described at 11:9–21 of the patent. |
| --- | --- |
| "indication of selection of the user-selectable element" | No construction necessary. |

To the extent the parties have not objected to the Special Master's constructions of certain claim terms, the Court accepts the Special Master's recommendations as to those claim terms without further comment. These terms are: "second information representing a communication from the second party" and "indication of selection of the user-selectable element."

**B.      Objections**

The Court now turns to the parties' specific objections.

**1.      "party"**

Defendants object to the Special Master's recommended construction of the term "party" because the Special Master's recommended construction does not limit the term to a person using a telephone. The Special Master's recommended construction is correct for two reasons. First, the patent itself plainly contemplates a connection being established between the parties prior to either party using a telephone. In particular, the first step in Claim 1 requires the parties to "establish[] an electronic communication . . . through the on-line data service" and exchange information. '836 Patent RC col.1 ll.30–57. Once this connection is established, and once one of the parties selects the proper element to initiate a voice call, the system begins the process of establishing a voice connection. *Id.* col.1 l.65 to col.2 l.8. While the patent obviously envisions the parties ultimately using a telephone, the parties are nevertheless parties prior to doing so.

-9-

Second, the term is not limited to an individual person. Defendants make much of DuVal's efforts to distinguish the '836 Patent from a prior art reference known as Blinken on the basis that Blinken involved the use of a conference bridge for conversations between more than two parties. As DuVal readily admitted at the time, the '836 Patent does not include the use of a conference bridge. As a consequence, the '836 Patent does not support three-way (or more) calling like the system described in the Blinken reference. But the '836 Patent includes no limitations on the number of individuals sitting behind each of the telephones ultimately used by the parties using its system. The invention will only connect two callers—i.e., two "parties"—but those callers could just as easily be groups of people using speaker phones as they could be individuals using handsets.

Accordingly, Defendants' objections to the Special Master's recommended construction are OVERRULED.

**2.     "on-line data service" and "on-line data system"**

Defendants object to the Special Master's recommended construction of the terms "on-line data service" and "on-line data system" for three reasons. First, Defendants claim the Special Master's recommended construction incompletely captures the patentee's lexicography. Second, Defendants argue the construction omits a prosecution history disclaimer. Third, Defendants argue the Special Master's proposed construction transforms the terms into means-plus-function terms, and the terms are indefinite for failing to disclose sufficient structure.

With respect to Defendants' first argument, Defendants and the Special Master agreed the patentee acted as his own lexicographer and defined on-line data system in the specification, but disagree about the scope of the definition. The relevant portion of the specification reads as follows:

The On-line data system **18** is a computing device with storage and communications capability which provides services such as electronic mail, chat, newsgroups, and access to information. Examples of the firms which provides these services are AMERICA ONLINE and PRODIGY. The Internet can also provide these services using a distributed architecture for the computing device.

The software which controls the On-line data system **18** is modified so that it exchanges messages with the personal computers **25, 26** related to the initiation of an anonymous voice call. The On-line data system **18** ensures that both parties want to establish an anonymous voice call, collects from both parties the information required to initiate an anonymous voice call, and sends a connect message **110** to the Anonymous Voice System **14** over the data communications link **68**. When the call is complete, the Anonymous Voice System **14** sends the on-line data system **18** a disconnect message.

'836 Patent col.8 ll.19–36.

The Special Master's recommended construction captures the first sentence of this description, in which the patentee described what "[t]he On-line data system **18** is," along with the reference to "distributed architecture" in the third sentence, as reflected by the words "distributed computing system." Defendants propose the Special Master also include language reflecting the first two sentences in the second paragraph, relating to features such as exchanging messages and collecting information.

The patentee simply defined on-line data system in the first paragraph. "The On-line data system **18** *is*" what the patent says it is: a hardware setup capable of delivering certain services. The second paragraph does not define what the on-line data system *is*; instead, it describes things "[t]he software which controls the On-line data system" *does. Id.* at col.8 ll.26–36. The fact these features appear in a separate paragraph and refer to the software—as opposed to the system itself—suggest the patentee was no longer defining the term in the second paragraph. Additionally, the final sentence of the second paragraph discusses something the voice system does. This sentence would be bizarrely out of place in a paragraph defining the term on-line data system. Finally, many of the

-11-

limitations Defendants seek to read into the construction of this term are covered by the Court's construction of other terms, or by the claims themselves. *E.g.*, '836 Patent RC col.2 ll.60–61 (requiring the on-line data system to "generate[] a connect command").

Second, Defendant Oracle alone argues DuVal disclaimed "monitoring and controlling a conference bridge, transferring notes between conferees, directory maintenance, update of information, or conference call reservations including conference name, date, start and finish time, conferee names and phone numbers," as functions of the on-line data service by distinguishing the '836 patent from the Blinken reference during prosecution. This appears to the Court to be a fair reading of DuVal's arguments to the patent examiner. Plaintiff essentially agrees, conceding that any system which provides *only* the functionality described by Blinken—"management and operation of a telephone conferencing system"—does not qualify as an on-line data service. Pl.'s Opening Post-*Markman* Br. [#99] at 12–13.

The Special Master was rightly hesitant to include this disclaimer, as the parties' arguments reveal this issue goes to the heart of the infringement case against Oracle's accused product. "While a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326–27 (Fed. Cir. 2006). The Court concludes adding the reasonable alternative disclaimer suggested by Oracle—modifying the construction to end with "access to information *beyond that used in the management and operation of a telephone conferencing system*"—would properly capture the scope of what both parties acknowledge DuVal disclaimed. The Court notes the decision to include this

disclaimer is not a resolution of the merits of Oracle's non-infringement argument, as the parties dispute whether Oracle's accused product is limited to the functionality described in Blinken and disclaimed by DuVal. The resolution of that dispute is for another day, and possibly for the jury to decide after hearing the evidence at trial.

Third, the Special Master correctly concluded these terms are not means-plus-function terms within the purview of 35 U.S.C. § 112(f). The patentee's failure to use the word "means" "creates a rebuttable presumption that [§ 112(f)] does not apply." *Phillips*, 415 F.3d at 1311; *see also Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350, 1356 (Fed. Cir. 2011) ("[T]he presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome."). Here, the specification identifies the structure: the "on-line data system" is "a computing device [or distributed computing system] with storage and communications capability." '836 Patent col.8, ll.19–25. This may not be a complex piece of hardware—it may even be, as Defendants suggest, an ordinary personal computer—but there is no requirement the structure be complex. The system is a hardware setup with certain features which does certain things as described by the embodiments in the specification and the claim terms themselves. Similarly, the "on-line data service" is something provided by the on-line data system. The system is the structure providing the service. Additionally, the literature suggests the patent's examples, such as America Online, were understood in the art at the time. Pl.'s Resp. Br. [#90-5], Ex. 12 (Microsoft Press Computer Dictionary defining "online information service" and listing America Online as an example).

Accordingly, Defendants' objections to the Special Master's recommended construction are OVERRULED IN PART and SUSTAINED IN PART, and the construction is ACCEPTED AS MODIFIED above.

3.      **"establishing an electronic communication between the first party and the second party"**

Defendants object to the Special Master's recommended construction of the term "establishing an electronic communication between the first party and the second party" on the grounds the Special Master's non-construction of this term leaves a dispute between the parties unresolved. More specifically, Defendants contend the term must be construed to resolve whether an advertisement on a webpage can qualify as an electronic communication *between* two parties, or whether the word *between* requires two-way communication. The parties presented numerous arguments on this point throughout their eight briefs, and the Special Master correctly concluded no construction was necessary because the words themselves do not require further explanation. More importantly, the "webpage advertisement" dispute is really an argument about infringement, not claim construction, and need not be resolved by the *Markman* order.

Accordingly, Defendants' objections to the Special Master's recommended construction are OVERRULED.

4.      **"on-line data service between the first party and the second party" and "on-line data system that is coupled to the data terminal of each party"**

Defendants object to the Special Master's refusal to construe the terms "on-line data service between the first party and the second party" and "on-line data system that is coupled to the data terminal of each party" in light of the Special Master's construction of the primary constituent terms within those terms, including "on-line data service," "on-line data system," "party," and "data terminal." Defendants object because the failure to construe this longer term omits a limitation restricting the patent to "bidirectional" communication. The Special Master correctly concluded it

-14-

was unnecessary to construe these longer terms to add this limitation, as the claims themselves are not limited to bidirectional communication. *See* '836 Patent RC col.1 ll.46–47 (requiring the first party to receive information from the second party). Grafting Defendants' proposed limitation into the claim terms would improperly limit the claims to the embodiments described in the specification. *See Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006) ("When the claim addresses only some of the features disclosed in the specification, it is improper to limit the claim to other, unclaimed features."); *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003).

Accordingly, Defendants' objections to the Special Master's recommended construction are OVERRULED.

5.      **"anonymous"**

Defendants object to the Special Master's recommended construction of the term "anonymous" for two reasons. First, Defendants fault the construction for not explicitly stating an individual's phone number can serve to identify an individual and thus render them non-anonymous. Second, Defendants argue the Special Master's construction incorrectly imposes a one-way anonymity requirement when the patent requires two-way anonymity.

Defendants' first objection is merely an infringement argument in disguise. Whether or not a phone number reveals an individual's identity, and thus renders the individual non-anonymous, depends upon the facts of each case. When Defendant Ingenio, Inc. requested a reexamination of the '836 Patent, it offered the same argument to the PTO, noting "if the telephone number and email are unpublished with respect to who the actual person is, identities are kept anonymous." Pl.'s Resp. Br. [#90-2], Ex. 9, at 15. There may be some situations—perhaps even many situations—in which

disclosing a telephone number could jeopardize anonymity. In such a case, a non-infringement argument on anonymity grounds may carry the day. But it would be improper to construe the word "anonymous" as categorically prohibiting the disclosure of telephone numbers when there are circumstances in which disclosing a telephone number would not render a party non-anonymous.

Defendants' second objection is based on a proposed construction too far divorced from the language of the actual claims. It is the claims which "define the invention," and therefore "are of primary importance, in the effort to ascertain precisely what it is that is patented." *Phillips*, 415 F.3d at 1312 (internal quotation marks omitted). The claims in this case speak solely to one-way anonymity. *See* '836 RC col.1 ll.33–34 (claiming the step of establishing an electronic communication "wherein the first party is anonymous to the second party"); *id.* col.2 l.30 (claiming a system wherein "the first party is anonymous to the second party prior to establishing a first voice connection between the parties"). Defendants' argument draws heavily on references to anonymity in the specification and the inventor's perceived purpose of the invention. As noted at the end of the background section of this order, the reexamination process drastically altered the scope of the claims of the '836 Patent, and resulted in claims focusing far less on anonymity than the original claims. As the Federal Circuit has noted, because changes in claim scope may occur "during the prosecution process, it is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is after allowance by the PTO." *Markman*, 52 F.3d at 985.

Accordingly, Defendants' objections to the Special Master's recommended construction are OVERRULED.

6.      "data terminal"

        Defendants object to the Special Master's recommended construction of the term "data

terminal" because the construction allegedly departs from the patentee's own definition in the

specification and the way an ordinarily skilled artisan would interpret the term.

        Defendants claim the specification defines the term data terminal, but they are mistaken. The

relevant portion of the specification reads as follows: "The data terminals **24, 26** *may be* any personal

computer with the ability to process and store data, display information, accept input via keyboard,

microphone, or writing tablet, and communicate with other devices via a serial port, modem, or

Local Area Network." '836 Patent, col.5 ll.28–32 (emphasis added). Defendants' proposed

construction, which tracked the specification exactly, would have improperly transformed this

description of possible embodiments into the only embodiments. *See Intamin Ltd. v. Magnetar*

*Techs., Corp.,* 483 F.3d 1328, 1335 (Fed. Cir. 2007) ("As this court has repeatedly noted . . . , a

narrow disclosure in the specification does not necessarily limit broader claim language." (citation

omitted)). Defendants' proposed construction is also more restrictive than the way their own expert

opined an ordinarily skilled artisan would interpret the phrase. *See* Defs.' Opening Br. [#88-6], Ex.

6 (Stevenson Decl.), ¶ 11 (opining the term would "mean a device that included an input device,

typically a keyboard, and a display device, typically a monitor, that could communicate with a

computer"). Stevenson's testimony thus shows a data terminal need not be limited to any particular

kind of input, output, or communications technology.

        The Special Master instead adopted Plaintiff's originally proposed construction, which is

based on a definition from the Institute of Electrical and Electronics Engineers' dictionary. *See* Pl.'s

Opening Br. [#87-8], Ex. 7, at 5 (defining "data terminal equipment" as "equipment comprising the

data source, the data sink, or both"). Defendants protest this definition is different because it adds the word "equipment" to the claim term "data terminal," but Defendants had no qualms about relying on their own dictionary definitions of "terminal," absent the "data" modifier. *See* Defs.' Opening Br. [#88], Exs. 14 (Microsoft Computer Dictionary defining "terminal" as "[a] device consisting of a video adapter, a monitor, and a keyboard"), 15 (Internet Dictionary defining "terminal" as "[a] keyboard and monitor combination . . . connected to a computer"), 16 (Barron's Dictionary of Computer Terms defining "terminal" as "an input-output device whereby a user is able to communicate directly with a computer"). Moreover, Defendants' definitions are largely consistent with the Special Master's recommended construction, which recognizes the core communications functionality of the terminal without limiting the terminal to specific forms.

As Plaintiffs recognize in their own briefing, construing "data terminal" as the Special Master has done does not mean every conceivable data terminal will be able to practice the claims. For example, Claim 1 specifically references displaying the "graphic user interface of the data terminal," which means any qualifying data terminal must have some means of displaying such an interface. '836 Patent RC, col.1 ll.41, 51. These limits are imposed by the claims themselves, and thus represent a preferable way of limiting what the patent covers than a single embodiment described in the specification.

Accordingly, Defendants' objections to the Special Master's recommended construction are OVERRULED.

7.   **"information publicly accessible"**

Defendants object to the Special Master's recommended construction of the term "information publicly accessible" because it ignores a disclaimer made by DuVal during the

prosecution of the patent. Throughout the *Markman* process, Defendants sought a construction of this term which included the phrase, "Information that is password protected is not 'publicly accessible.'" The Special Master correctly rejected such a construction, which was based on a myopic reading of DuVal's efforts to distinguish a prior art reference.

During prosecution of the '836 Patent, DuVal attempted to distinguish his invention from the Blinken reference. Blinken involved a teleconferencing system in which a "conference coordinator" chose individuals to participate in the conference, and then provided those participants with a login and password to access the system to share notes with other participants. Pl.'s Resp. Br. [#90-7], Ex. 14 (Blinken Patent). DuVal challenged the patent examiner's conclusion Blinken's shared notes were "publicly accessible" because they were "displayed to multiple participants." Defs.' Opening Br. [#88-17], Ex. 17, at CTC-004257–58. DuVal argued the '836 Patent described "publicly accessible" as much more widely available information, such as that available through America Online and Prodigy. *Id.* Blinken's shared notes were not "publicly accessible" because only participants hand-chosen by the conference coordinator were allowed to see them; there was no way for the general public to access the notes.

Defendants read this prosecution history as disclaiming, categorically, any information protected by a password. Yet Defendants admit the '836 Patent explicitly contemplates information provided by America Online and Prodigy. '836 Patent col.8 ll. 19–25. There is no dispute America Online and Prodigy were services which charged monthly fees and required passwords to access. Members of the general public could sign up for these services and use them after inputting a password. These services are easily distinguishable from Blinken's private teleconference system, which was much more like a traditional dial-in conference call line than an Internet service provider.

DuVal's efforts to distinguish Blinken merely reflect this fundamental difference, and sought to correct the patent examiner's incorrect understanding of "publicly accessible" as "displayed to multiple participants." DuVal confirmed this interpretation in distinguishing a different reference, explaining: "An ODS typically provides access to information such as stock prices, news, . . . and advertisements; and, this access is widely available subject to minimal constraints *such as subscription to the ODS, registration with the ODS, and/or ability to access the ODS*." Pl.'s Opening Post-*Markman* Br. [#99], Ex. 19, at CTC-004895 (emphasis added).

There are undoubtedly some password-protected services which would not qualify as "publicly accessible" because the public cannot subscribe or purchase a password. There may have been some middle-ground construction drawing a slightly more precise boundary around the scope of password-protected "publicly accessible" information, but throughout the briefing Defendants were unwilling to budge from their initial proposal categorically excluding all information protected by a password. Because the patent specification and DuVal's prosecution of the patent reveal some password-protected information may still be publicly accessible, a categorical exclusion would be improper.

Accordingly, Defendants' objections to the Special Master's recommended construction are OVERRULED.

## 8.   "requesting a voice communication between the first party and the second party through the on-line data service"

Plaintiff object to the Special Master's recommended construction of the term "requesting a voice communication between the first party and the second party through the on-line data service" because it is too narrow, resulting in the exclusion of a preferred embodiment. This term concerns

the process for establishing a voice connection between the parties. As the specification describes, the on-line data system "ensures that both parties want to establish an anonymous voice call, collects from both parties the information required to initiate an anonymous voice call," and then tells the voice system to initiate the call. '836 Patent col.8 ll.29–34. Claim 1 further describes this process, explaining that, after the first party indicates it wishes to establish a call, the first step is "requesting a voice communication . . . through the on-line data service." '836 Patent RC col.1 ll.65–67.

The parties' dispute centers around whether this request may originate from within the on-line data system itself, or whether it must come from outside of the on-line data system. As the word "through" implies, the request must originate outside of the on-line data system in order for the request to travel in one side of the system and out the other. DuVal explained this process to the patent examiner as follows: "DuVal's voice communication request is transmitted by DuVal's data terminal and received by DuVal's ODS. A voice communication request is initiated when one party inputs a command into their personal computer." Defs.' Opening Br. [#88-4], Ex. 4, at CTC-004727. DuVal went on to distinguish his invention from a prior art reference because in his invention, "[a] voice communication request is initiated when one party inputs a command into their personal computer." *Id.* Accordingly, DuVal contended his invention involved "the receipt of a request by the computer from a data terminal." *Id.* at CTC-004728.

As DuVal's explanation shows, the "requesting" action must originate outside of the on-line data system, otherwise the request cannot be "transmitted" to and "received by DuVal's ODS." *Id.* at 33. Imagine a quarterback who, instead of taking the football from the center to begin the play, simply started the play with the football in his hands. No one would claim the quarterback had "requested" the football, nor argue the ball was "transmitted" to or "received by" him; he had the ball

all along. Similarly here, the request described in this claim term must "originate[] outside the on-line data service," as the Special Master concluded, otherwise the request cannot be received by the ODS. If the ODS itself can originate the request, DuVal's explanation of the patent would make no sense, and he could not have distinguished his invention from the prior art. DuVal must be "held to what he declare[d] during the prosecution of his patent." *Gillespie v. Dywidag Sys. Int'l, USA*, 501 F.3d 1285, 1291 (Fed. Cir. 2007). To the extent one of the preferred embodiments described in the specification is incompatible with DuVal's description of his patent, DuVal's arguments during prosecution must control. *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers.").

Accordingly, Plaintiffs' objections to the Special Master's recommended construction are OVERRULED.

## 9.    "voice system"

Defendants object to the Special Master's recommended construction of the term "voice system" because, in adopting "the substance of Defendants' proposed construction" in a "more succinct[]" manner, "the Special Master erroneously introduced an ambiguity into subpart (c) of his construction." Def.'s Obj. [#129] at 1. To be clear, the Special Master actually recommended, verbatim, Plaintiff's alternative post-*Markman* proposed construction, and thus any drafting flaws should not be attributed to the Special Master. *See* Pl.'s Opening Post-*Markman* Br. [#99] at 6.[5]

---

[5] Additionally, although Defendants did dispute Plaintiff's alternative proposed construction of this term, this particular ambiguity was not raised in the post-*Markman* briefing.

Finger-pointing aside, Defendants argue the recommended construction's description of "software that causes the system to *make and/or receive*, and then connect, two telephone calls" is ambiguous because it is unclear whether the software must be capable of causing the system to (1) make calls, (2) receive calls, or (3) both. The specification declares "[t]he operation of the anonymous Voice System **14** is controlled by system software capable of executing transaction scripts which include commands . . . to answer incoming calls *and* dial outgoing calls," among other things. '836 Patent, col.6 ll.18–20 (emphasis added); *see also Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998) ("The best source for understanding a technical term is the specification from which it arose . . . ."). Based on this description in the specification, and the efforts of both the parties and the Special Master to produce a more specific construction of this term in light of the discussions at the *Markman* hearing, the Court finds the phrase "make and/or receive" in the Special Master's recommended construction is ambiguous and could be improved by redrafting subpart (c) of the recommended construction as Defendants suggest: "(c) software that has the capability to cause the system to both make and receive, and then connect, two telephone calls when directed by the on-line data service [or system]."

Accordingly, Defendants' objection to the Special Master's recommended construction is SUSTAINED, and the construction is ACCEPTED AS MODIFIED above.

**10.    "connect command"**

Plaintiffs object to the Special Master's recommended construction of the term "connect command" because it reads limitations from the specification into the claim. Claim 12 describes a system in which the on-line data system "generates a connect command in response to an input," and the voice system "receives said connect command and connects a first telephone call of the first party

-23-

with a second telephone call of the second party in response to the connect command." '836 Patent RC col.2 l.59 to col.3 l.4. Plaintiffs suggest not construing "connect command" and simply giving the term its "plain meaning." The difficulty with this approach is that Claim 12 only states a connect command is generated, it does not state what such a command is, and neither party presented any evidence suggesting how an ordinarily skilled artisan would interpret the term. Alternatively, Plaintiffs offered a construction which merely restated the language of Claim12, providing no additional guidance to the jury as to the meaning of the term.[6]

Defendants' alternative proposed construction, which the Special Master adopted, draws upon the figures and language of the specification to illuminate the meaning of the term. Figure 6 appears as follows:



The specification describes the various components of this connect message **110**:

> The message id **114**, identifies the type of the message connect **100** or disconnect **112**. The first caller info **116** and second caller info **118** describe each party. Caller info **122** contains the fields which describe each party. The message can contain an optional matchcode **120** which is not used to set up the "online" initiated call but can be used to set up subsequent calls using the "standalone" or "single party initiation" method.
>
> Caller information **122** provides detail on the fields used to describe each caller. A caller identifier **124** is used to identify a party requesting an anonymous voice call. In the preferred embodiment, this identifier would be the telephone number of the party. . . . The Dial in/Dial out field **126**, indicates whether the

---

[6] In essence, Plaintiffs would define the term by the result it causes (a connection) rather than by what its contents are.

Anonymous Voice System **14** should dial the party or the party will dial the system. The ODS ID field **128** identifies the On-line data system **18** which is initiating the request.

'836 Patent col.11, ll.1–21.

The Special Master's recommended construction thus confirms the "connect command" must include at least the basic information needed to establish a voice call. Other claims confirm Figure 6 accurately captures what is included in a "connect command" or "connect message," such as dependent Claim 14, which covers a system "wherein said connect command includes a matchcode." '836 Patent RC col.3 ll.8–9. Regardless of the precise design, the system needs some information "describ[ing] each party" so it can identify and connect them. The Special Master's construction omits other portions of Figure 6 which are explicitly described as optional (such as the matchcode **120**) or are rendered unnecessary by the claim language (the message id **114**, because the term itself states it is a "connect" command, not a "disconnect" command).

Plaintiffs contend the "Dial in/Dial out field **126**" is required only in some embodiments of the invention, and therefore it is improper to require it as part of the "connect command" term. First, Plaintiffs cannot cite any evidence in support of their contention that systems could be designed as dial-in-only or dial-out-only, as every discussion in the specification focuses on a combination dial-in/dial-out system. *E.g.*, '836 Patent col.4 ll.3–6; col.10 l.60 to col.11 l.21; col.17 ll.59–63; col.18 ll.46–51; col.20 ll.40–46. But even if such a system were contemplated, there is no evidence before the Court to indicate the "Dial in/Dial out field **126**" would not still be included, even if it always read "dial in" for a dial-in-only system or "dial out" for a dial-out-only system. The specification indicates the system must know whether to place the call or receive the call, even if the answer is the same in every case.

-25-

The inclusion of "ODS ID field **128**" results in a similar objection from Plaintiffs. Once again, nothing in the patent explicitly defines this field as optional, unlike the matchcode **120**. Claim 1 covers a method for establishing a voice connection using an on-line data service. '836 Patent RC col.1 l.65 to col.2 l.8. The ODS ID field **128** "identifies the On-line data system **18** which is initiating the request" to establish a call. '836 Patent col.11 ll.20–21. While the specification discusses various ways the information from the ODS ID field **128** can be used, such as linking billing information to the parties, no portion of the specification or the claims suggests the ODS ID field **128** can simply be removed. Rather, the claims disclose using the on-line data service to establish a voice connection, and the field identifying which on-line data system was used is as much a part of the invention as the information identifying the parties themselves.

Accordingly, Plaintiff's objections to the Special Master's recommended construction are OVERRULED.

### Conclusion

The parties' objections to the Special Master's recommended constructions are SUSTAINED IN PART and OVERRULED IN PART as described in this opinion, and the Special Master's recommended constructions are ACCEPTED AS MODIFIED, as indicated in the chart in this opinion.

Accordingly,

IT IS ORDERED that Plaintiff Click-to-Call Technologies LP's Objections [#130] are OVERRULED;

IT IS FURTHER ORDERED that Defendants' Objections [#129] are SUSTAINED IN PART and OVERRULED IN PART, as described in this opinion;

IT IS FINALLY ORDERED that the Report and Recommendation of the Special

Master [#124], including the Special Master's recommended constructions, is ACCEPTED

AS MODIFIED in this opinion.

SIGNED this the 15 day of August 2013.

SAM SPARKS
UNITED STATES DISTRICT JUDGE